UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PETER FOSTER, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 15-1126 |
| v. | : | OPINION |
| NATIONAL GYPSUM SERVICES COMPANY, et al., | : | |
| Defendants. | : | |

This matter is before the Court on Defendant's motion for summary judgment. The Court reviewed the submissions of the parties and has decided the motion on the papers pursuant to Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendant's motion will be granted.

Background

Plaintiff Peter Foster began his employment with NGC, at its Burlington, New Jersey facility ("the Facility") in 1987. (Pl. Dep. p. 12.)[1] Initially hired as a mechanic, Plaintiff was promoted to position of lead mechanic approximately nine years ago. (Pl. Dep. p. 12) Mechanics at the

[1] Plaintiff was never employed by National Gypsum Services Company, which is improperly named as a defendant in this matter. Plaintiff was employed by New NGC, Inc., d/b/a National Gypsum Company.

Facility are represented by the United Steelworkers of America, Local Union 2040-3 (Pl. Dep. p. 12-13.)

As lead mechanic, Plaintiff's objectives were to "[i]nstall, maintain and repair all plant mechanical, pneumatic, hydraulic and other systems relating to the manufacturing process." (Pl.'s Job Description; Pl. Dep. p. 13; 54-55.) The functions essential to attaining Plaintiff's job objectives include: "Install, maintain and report all mechanical equipment, read blueprints, and troubleshoot equipment and systems. Monitor and maintain equipment to ensure efficient operations." (Id.) The minimum qualifications needed to perform these essential job functions include the ability to "[t]roubleshoot and repair all plant equipment," "fabricate, repair and/or assemble from simple or complex drawings," "lift and carry up to 100 lbs.," and "operate a lift truck." (Id.) Plaintiff's job duties involved physical labor exclusively, and Plaintiff testified at his deposition that his position requires him to shovel, routinely lift up to 100 pounds, climb ladders and operate power tools, electric tools, hand tools, pneumatic tools, and hydraulic tools. (Pl. Dep. p. 54-55; Peterson Dep. p. 17.) Plaintiff stressed that his position is a "heavy-duty occupation," and requires him to, when using these tools, constantly apply a fair amount of force to, for example, industrial nuts and bolts. (Pl. Dep. p. 39, 55; Oxenford Decl. ¶ 9.)

On August 20, 2008, Plaintiff injured his back "lifting a piece of steel onto a saw," and, on the same day, injured his right shoulder while digging a trench with a shovel. (Pl. Dep. p. 25.) Plaintiff presented to a physician on September 2, 2008 and underwent an MRI. (Pl. Dep. p. 30-33.) On October 28, 2008, Plaintiff had arthroscopic surgery on his right shoulder to repair a labral tear. (2008 Operative Report.) Following his surgery, Plaintiff took a leave of absence, and thereafter returned to work sometime in 2009. (Pl. Dep. p. 37.)

In October 2013, Plaintiff began another medical leave of absence to undergo a second right shoulder surgery, this time performed by Mark Lazarus, M.D. (Pl. Dep. p. 47-48.) Prior to the surgery, Plaintiff indicated on an intake form in Dr. Lazarus's office that his shoulder still allowed him to work full time at his regular job. (Lazarus Dep. p. 12-13.) Dr. Lazarus performed Plaintiff's second shoulder surgery – a right shoulder humeral hemiarthroplasty with glenoid reaming arthroplasty (ream and run procedure) – on October 22, 2013. (2013 Operative Report.) A ream and run procedure involves the ball of the shoulder being replaced with a metal ball, and the hard, arthritic portion of the socket being reamed (grated) down to bleeding bone. (Lazarus Dep. p. 9-10.) The exposed stem cells

then become a soft lining and blood on the socket turns to a fibrous tissue. (Lazarus Dep. p. 9-10.)

Prior to the surgery, Dr. Lazarus estimated that Plaintiff would be able to return to work, full duty on February 1, 2014. (Lazarus Dep. p. 16-17.) However, as of a November 15, 2013 post-surgical visit, it was evident that Plaintiff's recovery was not proceeding as well as Dr. Lazarus anticipated, as Dr. Lazarus noted that Plaintiff was already "behind in his motion." (Lazarus Dep. p. 17-19.) Dr. Lazarus further testified that, as of January 24, 2014, Plaintiff was making appropriate progress, but was still nowhere near ready to return to work. (Lazarus Dep. p. 23.) Nor was Plaintiff able to return to work on February 1, 2014, as Dr. Lazarus initially anticipated. (Lazarus Dep. p. 23-24.)

On October 20, 2014, Dr. Lazarus provided Plaintiff with a note to give to NGC. (Silverman Cert. Ex. B, Lazarus note.) The body of Dr. Lazarus's note stated in its entirety:

> To Whom It May Concern:
>
> Please be advised that Peter Foster is under my care. The patient was last seen in my office on October 17, 2014. Mr. Foster is released from my care and may return to work.
>
> If you should have any questions, please do not hesitate to contact my office.

(Id.)

Plaintiff provided a copy of this note to Mike Wolverton, the HR Safety Manager of the Facility, who, on the same day, October 20, 2014, faxed a letter to Dr. Lazarus seeking clarification of the note. Wolverton testified at his deposition that Dr. Lazarus's note was not clear to him because it did not specify in what capacity Plaintiff was able to return to work. (Wolverton Dep. p. 21-22, 56.) Wolverton further testified that his goal in faxing the letter was to "find out from [Dr. Lazarus] if [Plaintiff] had any limitations." (Wolverton Dep. p. 24.) Wolverton's letter stated:

> Dear Mark Lazarus:
>
> Please review Pete Foster's job description and let me know if there are any activities listed Pete cannot perform? Thanks, let me know if you have any questions.

(Wolverton letter.) Wolverton enclosed a copy of Plaintiff's job description along with the letter and faxed the package to Dr. Lazarus. (Id.; Wolverton Dep. p. 56-57.) Wolverton testified that he received facsimile confirmation that his transmission of the letter and job description were received by Dr. Lazarus's office, and Dr. Lazarus similarly testified that his office received Wolverton's package. (Wolverton Dep. p. 24; Lazarus Dep. p. 41.) Dr. Lazarus, however, never reviewed Wolverton's letter or the job description that Wolverton sent to him, and never responded to Wolverton's request for additional information regarding Plaintiff's limitations, because, as he

testified, he never reads job descriptions, as he considers that to be a waste of his time. (Lazarus Dep. p. 14-15; 41-42.)

NGC nonetheless scheduled Plaintiff for a return to work/fitness for duty physical. (Oxenford Decl. ¶ 11.) Paul DeJoseph, D.O. conducted the fitness for duty physical on October 21, 2014. (DeJoseph Decl. ¶ 11, DeJoseph RTW note No. 1.)[2] Dr. DeJoseph is a licensed Osteopathic Physician and Surgeon and is board certified in Family Medicine and Osteopathic Manipulative Treatment. (DeJoseph Decl. ¶ 4.) Dr. DeJoseph reviewed Plaintiff's medical history and treatment with him. (Pl. Dep. p. 57.) Dr. DeJoseph then tested Plaintiff's shoulder by assessing, among other things, Plaintiff's range of motion, shoulder strength, and ability to bend and reach. (Pl. Dep. p. 57.) Dr. DeJoseph measured Plaintiff's shoulder abduction and noted when and where he was experiencing pain. (DeJoseph RTW note No. 1.) Dr. DeJoseph commented that: "P[atient] continues to have limited mobility and strength above shoulder level.

[2] Dr. DeJoseph regularly conducts return to work/fitness for duty physical examinations for NGC employees when they seek to return to work after medical leaves of absences. (DeJoseph Decl. ¶ 5; Oxenford Decl. ¶12.) Dr. DeJoseph toured NGC's Burlington, New Jersey plant in order to fully understand plant operations and the essential functions of the various jobs at the plant. (DeJoseph Decl. ¶ 6-7; Oxenford Decl. ¶ 13.) Additionally, he has reviewed the job descriptions for NGC's employees, including the job description for the lead mechanic position. (DeJoseph Decl. ¶ 8-9.)

Motions below shoulder level are intact." (DeJoseph RTW note No. 1.) Dr. DeJoseph also commented that Plaintiff was experiencing pain, and that, while he had some home exercises, he needed physical therapy in other to return to work safely. (DeJoseph RTW not No. 1.) Dr. DeJoseph was particularly concerned with Plaintiff's lack of upper body strength and told Plaintiff that he did not think he was ready to return to work without receiving upper body strengthening therapy. (Pl. Dep. p. 57-58.)

After Dr. DeJoseph's examination and recommendation, Plaintiff sought to obtain a physical therapy prescription from Dr. Lazarus. Dr. Lazarus initially declined to issue the prescription because, he testified, he did not believe physical therapy was indicated. (Lazarus Dep. p. 43.) Eventually, however, he prescribed the necessary physical therapy, which Plaintiff attended. (Pl.'s physical therapy prescription from Dr. Lazarus.) Plaintiff reported to his physical therapist that: "he has weakness and inability to elevate his arm out to the side" and "weakness and limitations with overhead activity." (Physical therapy record.) His physical therapist indicated that he was "a good candidate for skilled physical therapy to address [his] impairments and achieve the functional goals." (Physical therapy record.) Plaintiff consistently participated in physical therapy for his right shoulder, which involved range of motion and strengthening

activities to improve functional use of his right arm with tasks related to his job. (Physical therapy record.) Upon conclusion of his physical therapy regiment, Plaintiff was reexamined by Dr. DeJoseph, who determined that he was able to "return to work regular duty." (DeJoseph RTW note No. 2, 12-30-14.) Once Wolverton received this clearance, he called Plaintiff and told him to return to work on January 5, 2015. (Wolverton Dep. p. 50; Pl. Dep. p. 64.)[3]

On December 26, 2014, Plaintiff filed suit against his employer in the Superior Court of New Jersey, Burlington County Law Division. The Complaint alleges that Defendant discriminated against Plaintiff on the basis of a disability (Count I) or a perceived disability (Count II), failed to engage in the interactive process (Count III), and failed to accommodate Plaintiff's disability (Count IV) in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 ("NJLAD") when it denied Plaintiff the opportunity to work between October 20, 2014 and January 5, 2015.

[3] Dr. DeJoseph's second return to work note is dated December 30, 2014. Plaintiff testified that the difference in time, between December 30, 2014 and when he was asked to return to work on January 5, 2015, was due to a holiday (Pl. Dep. p. 64.)

Plaintiff argues he was not offered light duty, at one point was administratively terminated.[4]

The case was removed to this Court based on diversity jurisdiction, and Defendant now moves for summary judgment. Defendant first argues that Plaintiff cannot show he was disabled or perceived as disabled when he attempted to return to work in October 2014. Next, Defendant argues that Plaintiff cannot prove he could perform the essential functions of his position in October 2014. Alternatively, Defendant argues that Plaintiff has not produced any evidence from which a reasonable factfinder could believe Defendant's reason for not returning Plaintiff to work in October 2014 was pretextual. Finally, Defendant argues that Plaintiff never requested an accommodation.

Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56

[4] Plaintiff also stated that he experienced an interruption in his insurance and 401(k) benefits, but admitted that these were clerical mistakes that were rectified. (Pl. Dep. p. 72-75.)

(a). The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts

showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility

determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

NJLAD

Generally

New Jersey has adopted the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as the starting point in circumstantial evidence discrimination actions brought under its Law Against Discrimination. Andersen v. Exxon Co., U.S.A., 446 A.2d 486, 490-91 (N.J. 1982). Though the McDonnell Douglas framework is followed in cases of discriminatory discharge, the elements of the *prima facie* case are modified to fit the circumstances. Clowes v. Terminix Int'l, Inc., 538 A.2d 794, 805 (N.J. 1998); Bell v. K.A. Indus. Services, LLC, 567 F. Supp. 2d. 701, 706 (D.N.J. 2008).

Failure to Accommodate

To make out a *prima facie* failure to accommodate claim under the NJLAD, Plaintiff must show that: (1) he was disabled or perceived to have a disability[5]; (2) he was otherwise qualified to perform the essential functions

---

[5] The NJLAD refers to "handicap," but defines handicap as a disability. Courts have used the terms interchangeably in this context. See Victor v. State, 4 A.3d 126, 135 (N.J. 2010).

of the job, with or without reasonable accommodation by the employer; (3) he suffered an adverse employment action because of the disability. Victor v. State, 952 A.2d 493, 503 (N.J. Super. Ct. App. Div. 2008), aff'd as modified, 4 A.3d 126 (N.J. 2010). As to the second element, an example of a reasonable accommodation is a leave of absence. N.J. Admin. Code 13:13-2.5(b)(1)(ii).

When an employee requests accommodation, the employer has a duty to engage in an interactive process in an effort to assist the employee. Jones v. United Parcel Svc., 214 F.3d 402, 408 (3d Cir. 2000). To show that an employer failed to participate in the interactive process, "the employee must show the employer was informed of the disability, the employee requested accommodation, the employer made no good faith effort to assist, and the accommodation could have been reasonably achieved" but for the employer's lack of good faith. Victor, 952 A.2d at 504 (citing Tynan v. Vicinage 13 of the Superior Court, 798 A.2d 648, 657 (N.J. Super. Ct. App. Div. 2002)). "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the]

employee's request, and offer and discuss available alternatives when the request is too burdensome." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317 (3d Cir. 1999) (in the context of ADA and PHRA claims).

Analysis

Because Defendant's doctor did not clear Plaintiff to return to work in October of 2014, the Court will proceed on the assumption that he was perceived to be disabled at that time. Even so, Plaintiff has not established a *prima facie* case under the NJLAD because there is no record evidence to show he could perform the essential functions of his position in October 2014. Rather, Plaintiff's treating physician never reviewed the job description provided in order to make that determination.

For Plaintiff to return to work in October 2014 following his medical leave of absence, Defendant's company policies and practices provide that Plaintiff was to provide Defendant with: (1) a release from his treating physician stating he could return to work, and (2) clearance from Defendant's occupational health provider. (See Oxenford Decl. ¶ 4.) [6]

---

[6] Defendant's policies and practices for returning to work after a medical leave of absence are designed to ensure the safety of both the returning worker and his co-workers and to enable Defendant to determine whether a returning employee can perform the essential functions of the job, with or without a reasonable accommodation. (Oxenford Decl. ¶ 6.)

In addition, there is no evidence in the record before the Court that Plaintiff requested light duty or any other accommodation during his fifteen-month leave of absence. Instead, the testimony indicates that Plaintiff never asked for any accommodation, (Pl. Dep. p. 75-76), and Defendant was working toward returning Plaintiff to his position with no restrictions by referring him to appropriate medical care. Plaintiff concedes that "an employer may ask an employee to submit to examination by the employer's physician if the employer has a reasonable belief that the employee's medical condition will impair his ability to perform his job." (Pl. Br. [un-numbered] p. 11.)

Because Plaintiff has failed to establish a prima facie case of disability discrimination, the Court need not consider whether a reasonable factfinder could believe Defendant's reason for not returning Plaintiff to work in October 2014 was pretextual.

Conclusion

Accordingly, Defendant's motion for summary judgment will be granted. An appropriate Order will accompany this Opinion.

Dated: August 11, 2016

/s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.